## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ANNIE FARMER,

      Plaintiff,                          CASE NO:

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN, and
GHISLAINE MAXWELL,

      Defendants.

_____ /

## **COMPLAINT**

BOIES SCHILLER FLEXNER LLP

1

Plaintiff Annie Farmer, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein") and Ghislaine Maxwell ("Maxwell") (collectively, "Defendants"), avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

## NATURE OF THE ACTION

1.      This suit arises out of Defendants' sexual abuse of Plaintiff beginning when Plaintiff was 16 years old.

2.      When Plaintiff was 16, she was sexually trafficked by Defendants as part of Epstein and Maxwell's organized ring of procuring young women and girls for sex.

3.      Epstein's trafficking scheme involved recruiting young women and girls by making false promises and using his wealth, power and threats to intimidate the females into submission to his demands.  This same pattern was repeated numerous times with numerous young women and girls.

4.      As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach, Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually.  Epstein used paid employees to find and bring minor girls to him.  Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others."  *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5.    Epstein organized this sex trafficking network to obtain hundreds of young girls for himself for sex, and also lent these girls out to other powerful and wealthy individuals to be sexually abused.

6.     Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida.  Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims.  Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution.  Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

7.    The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

8.    A few years later, Epstein flippantly referred to his sexual abuse of multiple young women and girls, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a person who steals a bagel,' said Epstein."  Amber Sutherland, *Billionaire Jeffrey Epstein:  I'm a Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011), https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

3

9.     In August 2018, just one year before his death, Epstein told a New York Times reporter "that criminalizing sex with teenage girls was a cultural aberration and that at times in history it was perfectly acceptable."  James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on Powerful People*, N.Y. Times (Aug. 12, 2019),

https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

10.     Maxwell spent years overseeing and managing Epstein's sex trafficking network, and actively recruited underage girls to provide to Epstein and others for sex.

11.     Epstein and Maxwell conspired with friends and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris.  Epstein's preference was to have three different girls a day for his sexual pleasure and Maxwell was in charge of recruiting the girls.

12.     Maxwell facilitated Epstein's sexual trafficking ring by activities including, but not limited to: (1) identifying and recruiting girls, including several minors, for Epstein's sexual pleasure and that of his co-conspirators, including herself; (2) identifying and hiring individuals to recruit underage girls; (3) scheduling appointments between the trafficked girls, many of whom were minors, and Epstein; (4) administering Epstein's sex trafficking organization and hiding it from criminal repercussions; and (5) intimidating girls, many of whom were minors, who attempted to escape or report Epstein's sex trafficking operation.

13.     Epstein and Maxwell committed sexual assault and battery upon Plaintiff when she was 16 years old.  As such, the Defendants are responsible for battery, unlawful imprisonment, and intentional infliction of emotional distress pursuant to New York common law.  The damage to Plaintiff has been severe and lasting.

14.      This action has been timely filed pursuant to the Child Victims Act, N.Y. C.P.L.R.

§ 214-g.  The actions described herein constitute sexual offenses by Defendants under New York

Penal Law Article 130, and were committed against Plaintiff when she was a child less than

eighteen years of age, for which she suffered physical, psychological, and other injuries as a

result.

15.      This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides

that a plaintiff shall have at least one year from the termination of a criminal action against the

same defendant to commence an action with respect to the event or occurrence from which the

criminal action arose.  A criminal action against Epstein with respect to the same sex trafficking

enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

16.      Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the

continuous and active deception, duress, threats of retaliation, and other forms of misconduct that

Defendants used to silence their many victims, including Plaintiff.  Defendants' actions deprived

Plaintiff of the opportunity to commence this lawsuit before Epstein's death.  Until his death,

Plaintiff feared that Epstein and his co-conspirators, including Maxwell, would harm her or her

family, or ruin her life, if she came forward.

17.      Defendants are equitably estopped from asserting a statute of limitations defense.

Allowing Defendants to do so would be unjust.  Defendants intimidated each of their victims into

silence by threatening their lives and their livelihoods.  They therefore prevented Plaintiff from

commencing this lawsuit before Epstein's death.  By using threats, along with his wealth and

power, Epstein was able to escape punishment for his intolerable and brutal crimes against

countless young women and underage girls for the duration of his life.

## PARTIES

18.     Plaintiff Annie Farmer is a citizen and resident of Texas.

19.     Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

20.     Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

21.     Defendant Ghislaine Maxwell is a New York citizen and is domiciled in the Southern District of New York.

## JURISDICTION AND VENUE

22.     Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death.  Jeffrey Epstein maintained a residence in the Southern District of New York.  As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

23.     Defendant Maxwell is a citizen of both the United States and the United Kingdom and is domiciled in the Southern District of New York.

24.     The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

25.     Venue is proper in this Court as the sexual abuse of Plaintiff by Defendants Epstein and Maxwell began and occurred in New York, New York, where they recruited her at the age of 16, physically molested her, and began grooming her for sex in their organized sex trafficking ring.

26.     Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located.  Thus, venue in this district is proper.  28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A.     Epstein's Sex Trafficking Enterprise

27.      Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his coconspirators, and some of the most powerful people in the world.

28.     Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, and at 49 Zorro Ranch Road, Stanley, New Mexico 87056, where the illegal sexual crimes against Plaintiff occurred.  Epstein conservatively valued his New York townhome at $55,931,000.00.  Epstein conservatively valued his New Mexico ranch at $17,246,208.00.  In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young girls servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

29.     The allegations herein concern Epstein's and Maxwell's tortious acts against Plaintiff while in New York, where Epstein was staying at his 71st Street mansion, and at his ranch in New Mexico.

30.     At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse.

31.     Epstein and Maxwell had perfected a scheme for manipulation and abuse of young females.  As part of the scheme, Maxwell or another female would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose.  Maxwell would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times Maxwell's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.  Once in the residence, Maxwell and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.  They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse.  They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.  Once abused, Epstein and Maxwell continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

**B.      The Arrest, Prosecution, and Death of Epstein**

32.     The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591.  He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

33.     The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

34.     Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali.  The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

35.     Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

36.     Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

37.     Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019.  *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

38.     Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate.  *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

39.     The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate."  The Will further directs that "after the

payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real

and personal, wherever situated . . . to the then acting Trustees of The 1953 Trust."

40.     Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the

criminal matter against him because it was required by law to do so after Epstein was deceased.

On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's

indictment against Epstein, terminating the criminal action against him.

**C.**     **Annie Farmer**

41.     Annie Farmer was born on July 2, 1979.  Ms. Farmer's parents divorced when she was

young, and her mother struggled financially to support Annie and her siblings.

42.     In 1995 and 1996, Annie was a high school student at Xavier College Preparatory in

Phoenix, Arizona.  She was a top performing student with the goal of going to college.

43.     In approximately 1995, Annie's sister, Maria Farmer, was an artist and a graduate student

in New York.  She met Epstein and Maxwell at an art show.  Epstein noticed her artwork.

Epstein offered to help her in her art career if she sold Epstein some of her artwork.

44.     Epstein asked Maria if she had a father.  He also asked her personal questions about her

family situation, including about her younger sister, Annie.  Maria explained that her parents

were divorced, and that she and her family were financially struggling.

45.     Maria accepted a job offer from Epstein to purchase art for him.

46.     Her role later included keeping records of people who entered Epstein's New York

mansion.  Maria observed that Defendant Maxwell was regularly bringing over school-aged girls

to the New York mansion.  Maxwell told Maria that these girls were interviewing for Victoria's

Secret modeling positions.

47.     Maxwell described her role to Maria as recruiting Victoria's Secret models for Epstein. Maria witnessed Maxwell spotting girls and talking to them outside of the mansion, which Maxwell claimed was for recruiting purposes.  Maxwell would leave the mansion claiming she had "to go get girls for Jeffrey."

48.     At the time, Maria was unaware of the sex trafficking conspiracy and believed the girls were being recruited for modeling positions.

49.     Annie understood her older sister, Maria, to be working for a billionaire in New York.

50.     Epstein began taking an interest in Annie.  He asked Maria questions about her younger sister in Arizona.  He presented this interest to Maria in a friendly and fatherly manner.  Maria was very proud of Annie's strong academic record, and supported Annie's goal of going to a good college after high school.

51.     Epstein offered Maria ideas on how he could help Annie get into college.  He used this as a ruse to get Annie to come to New York so that he could abuse her.  Epstein purchased Annie's plane tickets, and she flew to New York.

52.     Epstein gave Maria money to buy Annie a dress.  He paid for a limousine to pick up the sisters and take them to Epstein's townhome.  He talked to Annie about going to college and potential schools before sending them to see a Broadway show.

53.     During Annie's stay in New York, Epstein asked Annie and Maria to go to the movie theater with him.  This is where he began initiating non-consensual physical contact with Annie in an attempt to groom Annie for sexual activity and normalize sexual behavior with him.

54.     At the movie, Epstein intentionally positioned himself between the sisters to ensure they were separated, and to prevent Maria from seeing that he was touching Annie.  Epstein began caressing and petting Annie on various parts of her body against her will.   He would repeatedly

touch Annie only when Maria was unaware and looking away.  Annie was distressed, frightened, and confused.

55.     Annie then left to go back home to Arizona.

56.     Epstein began calling Annie and her mother from New York under the false pretense of discussing Annie's education and plans for college.  He offered to send Annie on an international trip to help with her college applications.

57.     As part of his plan to recruit Annie for sexual purposes, Epstein explained to Annie's mother that he sponsored educational trips for high school students, and was sponsoring an event in New Mexico at his ranch called Zorro Ranch.  He invited Annie.  He explained that Maxwell would be a host or chaperone for Annie at the event.  Under these false pretenses, Annie's mother agreed to send Annie to Epstein's program for high school students.

58.     Epstein and Maxwell, who were in New York at the time, arranged and paid for Annie to fly to New Mexico in the spring of 1996.  Epstein mailed her airline tickets from New York to her mother in Arizona.  When Annie arrived in New Mexico, Epstein had a driver take her to his ranch.  Epstein's Zorro Ranch sits on over 10,000 acres and is very remote.  Upon arriving at the ranch, Annie learned that Epstein had not invited any other students.  She was the only person at the massive ranch in a different state, away from her family in Arizona, her sister in New York, and anyone she knew.  She was alone with Maxwell and Epstein.

59.     Maxwell appeared charming and friendly to Annie.  Upon arriving, Maxwell and Epstein took Annie shopping and lavished her with gifts, including beauty products and a pair of brand new cowboy boots.  After returning to the ranch, Maxwell began pressuring Annie to touch Epstein and give him a foot massage.  Annie was very scared and did not want to touch Epstein, but Maxwell was relentless and demanded that Annie massage Epstein.  Both adults explained to

Annie that it was just a massage, and attempted to normalize this sexual behavior with an adult to her.

60.     Epstein and Maxwell took Annie to a movie theater.  While in line for the movie, Maxwell pulled down Epstein's sweatpants, exposing part of his buttocks.  Both Epstein and Maxwell repeatedly fondled each other in front of Annie, trying to normalize sexual behavior to Annie, a child.

61.     In the movie theater in New Mexico, Epstein caressed and petted various parts of Annie's body against her will.  Annie was incredibly scared, and did not know how to escape because she was a child alone with Epstein and Maxwell.  Annie did not have a phone or any other means of communication without Epstein or Maxwell knowing.

62.     Epstein, Maxwell, and Annie returned to Epstein's ranch.  Upon returning from the movie, Maxwell repeatedly told Annie that she wanted to give her a massage.  Annie was very uncomfortable with the idea of Maxwell touching her, but realized that she was completely alone with Epstein and Maxwell.  Annie feared what would happen if she did not comply with their demands.  Annie said that she had never had a massage and tried to avoid having Maxwell touch her body, but Maxwell continued to pressure her.  Maxwell directed Annie to take off all of her clothes and lay on the massage table.  Annie was extremely scared to be naked in front of Epstein and Maxwell.

63.     Maxwell left the door open so that Epstein could view Annie's naked body during the massage.

64.     Maxwell touched intimate parts of Annie's body against her will for the sexual benefit of Maxwell and Epstein.

65.     Maxwell exposed Annie's breasts and groped her.

66.     Annie was extremely distressed and afraid.  She was a child in a massive ranch in New Mexico, away from her family in Arizona, and isolated from any source of help.  She was alone with Epstein and Maxwell.  She had no way to access a phone or other method of communication without Epstein or Maxwell knowing.  She had no way of leaving.

67.     Annie woke up the next morning to find Epstein entering her room.  He climbed into the bed with her and announced, "I want to cuddle."  Without her consent, Epstein got into the bed with Annie, physically restrained her with his arms and proceeded to press his body (including his genitals) against Annie.  Annie was frozen in fear.  She was sixteen years old.

68.     Annie knew she had no way of escaping Epstein's massive estate, and attempted to escape by saying she needed to use the restroom.  She was in shock, and frightened by what she was experiencing.  She feared for her safety, knowing she was alone in Epstein's ranch in another state and that Maxwell and Epstein were closely monitoring her activity.

69.     Annie escaped to Epstein's bathroom.  She was in extreme fear and emotional distress, not knowing how to escape Epstein's ranch in New Mexico, where these two adults were groping her, a child, against her will.

70.     Epstein and Maxwell eventually allowed Annie to fly back home to Arizona and they returned to New York.  Out of fear of what could happen to her and her family because of Epstein and Maxwell's great power, wealth, and connections that they had displayed to her, Annie did not tell anyone about Epstein and Maxwell touching her against her will.

71.     Devastatingly, Annie was not the only Farmer family member that Epstein and Maxwell sexually abused.  During that summer, Maria was lured into an "artist in residence" position by Epstein at billionaire Les Wexner's Ohio estate on which Epstein owned a guest house.  There, Epstein and Maxwell both sexually assaulted Maria.  Wexner's security personnel did not allow

Maria to exit his estate, even after she pleaded with them and told them about her assault.  There was only one entrance with a guard house to Wexner's estate.

72.     After Maria's sexual assault in Ohio, Maxwell called on behalf of Epstein and threatened Maria in order to keep her quiet: "We're going to burn all your art.  And I just want you to know that anything you ever make will be burned.  Your career is burned."

73.     Instead of letting Maxwell's words silence her, Maria reported her assault to the Sixth Precinct of the New York City Police Department ("NYPD"). The NYPD referred Maria to the Federal Bureau of Investigation ("FBI").  Maria followed the instruction and called the FBI to make a report of the abuse.  To the extreme detriment of Maria and Annie—and also countless other victims who came after them—authorities ignored Maria's reporting efforts and took no action.

74.     Maria also called Annie, who was overseas studying at an educational seminar for high performing high school students.  During the call, Annie shared with Maria her own assaults in New York and New Mexico, as well as her false imprisonment at Epstein's New Mexico ranch.

75.     Frustrated that authorities did not appear to be taking any action and in the hopes of exposing the crimes that Maxwell and Epstein were committing, Annie and Maria decided to share their stories with Vanity Fair magazine. Tragically for Annie and Maria, Epstein threatened and intimidated the magazine and Vanity Fair bent to those threats and ultimately published a profile of Epstein without mentioning the sisters or their allegations.

76.     Once Maxwell and Epstein learned that Maria had revealed the abuse to Vanity Fair, they embarked on a campaign to destroy Maria's reputation and art career.  Afraid for her safety, having informed the NYPD, FBI, and media to no avail, Maria left New York and Annie moved

to Alaska.  Annie and Maria's fear of Epstein's power was exacerbated by the fact that state and federal authorities, as well as the media, were not taking action against Epstein.

77.     Annie was deeply affected by her harrowing experiences at the hands of Epstein and Maxwell as a child.  She suffers severe emotional distress from an experience that has affected her for her entire life.

78.     The Defendants' sexual assault, battery, and false imprisonment of Annie continue to cause her significant distress and harm.

## FIRST CAUSE OF ACTION

### (Battery)

79.     Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

80.     Epstein and Maxwell intentionally committed battery by sexually assaulting Plaintiff when she was a young girl.  As described above, on multiple occasions Epstein and Maxwell intentionally touched Plaintiff in an offensive and sexual manner without her consent.

81.     Epstein and Maxwell's actions constitute sexual offenses as defined in New York Penal Law Article 130, including but not limited to forcible touching as defined in Article 130.52, inasmuch as Epstein and Maxwell intentionally and forcibly touched sexual and intimate parts of Plaintiff's body for their own sexual gratification on multiple occasions.  *See* N.Y. C.P.L.R. § 214-g.

82.     A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

83.     As a direct and proximate result of Epstein's and Maxwell's criminal acts, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION

### (False Imprisonment)

84.     Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

85.     As a direct result of these allegations as stated, Defendants falsely imprisoned Plaintiff at Epstein's New Mexico residence while Plaintiff was a young girl for the purpose of degrading her, abusing her, or gratifying their sexual desires.

86.     Epstein and Maxwell brought Plaintiff to Epstein's New Mexico Ranch with the intent to confine her in that location so that they could sexually abuse her.  Plaintiff was conscious of her confinement and did not consent that confinement.  Epstein and Maxwell prevented Plaintiff, a child with no way to communicate with anyone other than Epstein and Maxwell and with no access to a car or other means of transportation, from leaving the premises, Epstein's remote 10,000 acre Zorro Ranch in New Mexico.

87.     A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

88.     As a direct and proximate result of Epstein and Maxwell's criminal acts, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## THIRD CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

89.     Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

90.     As a direct result of these allegations as stated, Defendants committed intentional infliction of emotional distress against Plaintiff.

91.     Defendants' actions, described above, constitute extreme and outrageous conduct that shocks the conscience.  Epstein and Maxwell's plan to recruit, entice, and assault Plaintiff, a sixteen-year-old child, on multiple occasions, goes beyond all possible bounds of decency and is intolerable in a civilized community.

92.     Defendants knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

93.     A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's third cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

94.     As a direct and proximate result of Epstein and Maxwell's criminal acts, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.


Dated:  November 12, 2019.

<div style="margin-left:40%">

/s/ Joshua I. Schiller

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

Sigrid McCawley
(Pro Hac Vice Pending)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

</div>